NUMBER 13-07-00511-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


JACOB DWIGHT DAVIS, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 377th District Court of Victoria County, Texas.


 


MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Garza and Vela


Memorandum Opinion by Justice Garza


 

 Appellant, Jacob Dwight Davis, was charged by indictment with aggravated robbery,
a first-degree felony. (1) See Tex. Penal Code Ann. § 29.03 (Vernon 2003). After a trial
before a Victoria County jury, Davis was convicted of the offense. The jury sentenced
Davis to sixty years' imprisonment in the Texas Department of Criminal Justice-Institutional
Division and assessed a $10,000 fine. On appeal, Davis argues that: (1) the evidence
adduced at trial was legally and factually insufficient to establish the use or display of a
deadly weapon in connection with a robbery; (2) the evidence was factually insufficient to
connect Davis to the alleged aggravated robbery; and (3) his trial counsel provided
ineffective assistance of counsel. We affirm.

I. Factual and Procedural Background

 On May 3, 2007, a Victoria County grand jury indicted Davis with aggravated
robbery. The indictment provided the following, in relevant part:


 JACOB DWIGHT DAVIS . . . on or about the 29th day of March A.D., 2007,
. . . did then and there, while in the course of committing theft of property and
with intent to obtain or maintain control of said property, intentionally and
knowingly threaten or place MICHAEL DEMAS in fear of imminent bodily
injury or death, and the defendant did then and there use or exhibit a deadly
weapon, to wit: a firearm, that in the manner of its use or intended use is
capable of causing death or serious bodily injury.[ (2)]


A. State's Evidence


 Ashley Godfrey and Stephanie Gallaher testified that on March 29, 2007, they
arrived at the Maximus Gentlemen's Club in Victoria, Texas, between 1:00 a.m. and 2:00
a.m. The purpose of their visit was to meet Taylor Kelly, a friend of theirs from high school. 
Kelly worked at the club as a waitress. Once Godfrey and Gallaher arrived at the club,
three males and one female congregated by their car and followed them as they walked
towards the club. Godfrey testified that the four individuals wore black hooded sweatshirts
and were intimidating. Once Godfrey and Gallaher reached the door to the club, the three
males and one female "gathered around us [Godfrey and Gallaher] and wouldn't let us in
the bar." Godfrey and Gallaher both noted that one of the males in the group placed his
arm on the door to prevent the girls from entering the club. Godfrey and Gallaher,
however, were able to successfully enter the club despite the group's efforts. 

 The group followed Godfrey and Gallaher into the club. Upon entering the club,
Godfrey and Gallaher encountered the club's bouncer, Michael Demas. Demas refused
to grant Godfrey and Gallaher permission to enter the club because neither Godfrey nor
Gallaher were escorted by a male or were at least twenty-one years old. In any event,
Godfrey and Gallaher notified Demas that they: (1) were being followed by a group of
three males and one female; (2) were afraid to go back outside; (3) did not want to go back
outside by themselves; and (4) were there to see their friend, Kelly. Demas, however,
continued to insist that Godfrey and Gallaher could not enter the club. Demas
subsequently turned his attention to the group of people behind Godfrey and Gallaher.

 The testimony at trial established that the group of people behind Godfrey and
Gallaher was comprised of two African-American males, one possibly Hispanic male, and
an African-American female. Demas, Godfrey, and Gallaher each testified that the group
of individuals was acting strangely prior to and during their interaction with Demas. Demas
testified that the group moved along the wall of the club, never showing their backs to him,
which, according to Demas, was strange. Demas further testified that the leader of the
group, a tall, dark-skinned African-American later identified as Davis, never paid the cover
charge to get into the club, and that Davis never made eye contact with Demas. Instead,
Davis looked around the club suspiciously. Demas suspected that Davis was "casing" the
club. Godfrey stated that Davis was jumping around and saying that he was paranoid. 
Godfrey noticed that Davis's eyes were dilated, he was jittery, and he was shaking. 
Gallaher believed that Davis was on drugs because he was pacing back and forth. While
Demas was dealing with Davis and his friends, Kelly met up with Godfrey and Gallaher in
the doorway of the club. Shortly thereafter, Davis grabbed the tip jar that was at Demas's
station and proceeded to quickly exit the club. Demas pursued Davis and eventually
caught up to him. Demas wrestled with Davis, forced him to the ground, and retrieved the
tip jar. At the time that Davis absconded with the tip jar, eyewitnesses were unable to
pinpoint the location of the rest of the group members.

 Seconds later, Davis returned to the club aiming a firearm at Demas's head. As
Davis raised the firearm to Demas's head, Demas yelled "[g]un" and ran away from Davis. 
Chaos ensued inside the club. The lights in the club were turned out, and the patrons of
the club scurried to safety. Godfrey recalled hiding near the cash register and Gallaher hid
in the men's restroom. Kelly testified that she was knocked against the wall of the club,
and that during the ruckus, she dropped the tips that she had earned that night. As
everyone in the club ran for cover, Kelly kneeled to recover the tips that she had dropped
on the floor and observed Davis with the firearm raised. (3) According to several
eyewitnesses, Davis pulled the trigger of the firearm repeatedly, producing at least three
audible "clicks." 

 After realizing that his firearm had malfunctioned, Davis proceeded to the nearby
cash register. Demas testified that Davis fumbled around with the cash register while still
holding the firearm up. While Davis fumbled around with the cash register, Demas found
an empty beer bottle that he intended to use as a weapon to ward off Davis. Demas then
pursued Davis with the beer bottle. Davis, unable to get the cash register open and seeing
Demas with the beer bottle, fled the club. Demas then threw the beer bottle at Davis, but
Davis was able to escape the club unharmed. Demas identified a picture of a black
revolver found near the club as the one Davis used in the club. Demas testified that the
police came to investigate the scene within five minutes of Davis's escape from the club. 

 Katie Martinez, a nursing student living in the apartment complex next to the club,
testified that there is an alleyway between her apartment and the club and that her mother
and grandmother, while sitting near a window in the apartment, overheard a group of
people exclaim "[c]hunk it, chunk it, the cops are coming" from the nearby alleyway. At this
point, Davis's trial counsel objected to Martinez's testimony as hearsay. The State argued
that Martinez's mother and grandmother immediately told Martinez about the incident and
that the statements were admissible under the present sense impression exception to the
hearsay rule. See Tex. R. Evid. 803(1). After a conference at the bench, the trial court
overruled Davis's objection. Martinez then noted that her mother said, "Come, look, look,
look, they're running from the cops, they've thrown something." Martinez admitted that she
did not ever see any object thrown, and that she only saw the police when she arrived at
the window. 

 Officer Kevin Wilkins of the Victoria Police Department testified that he responded 
to a dispatch call pertaining to the club at 1:30 a.m. on March 29, 2007. With respect to
the nature of the call, dispatch told Officer Wilkins that "[t]hey said a subject with a gun had
pulled it out on someone at Maximus and they had fled, fled the scene." Officer Wilkins
noted that:

 Whenever I first pulled up I saw a White male, it was Mr. Demas, the
victim, he came out. And there was two other males in the parking lot. And
he said man, this guy just pulled a gun on me, he's wearing a gray sweater
with the number seven on it. And the other two . . . males, I didn't get them
identified because we were in a hurry. They said they ran north, we saw
them come around the fence.[ (4)]

 

 . . . .


 And that's the description I had, a Black male, and they said that there
was--there was a total of four subjects, there was a Black female and two
Black males, I think a Hispanic male, we weren't sure. He said we know it
was three guys and a girl.


 Officer Wilkins found the group in the apartment complex where Martinez lived. 
Officer Wilkins stated that "[t]hey were in front of I believe it was Apartment Number 2. 
They [the three males and one female] were huddled down real quiet and then we saw
them." One of the members of the group matched the description of the gunman provided
by Demas. Officer Wilkins proceeded to apprehend the group and instructed Demas to
identify the perpetrator; Demas identified Davis as the gunman.

 Davis was subsequently arrested and read his Miranda rights. See generally
Miranda v. Arizona, 384 U.S. 436 (1966). Davis identified himself to law enforcement as
Asian Perry, a false alias. Police, however, were able to identify later Davis based on a
tattoo he had on the back of his neck, stating "Mae-Mae." Officer Wilkins testified that one
would have to get close to Davis in order to view the tattoo and that it did not seem like
Davis was on drugs. Instead, Davis just glared at Officer Wilkins when asked questions
and was generally uncooperative. 

 Detectives Jonathan Allen and Kevin Kroos of the Victoria Police Department
coordinated the investigation under the supervision of Sergeant Olga Gamez. In searching
the area surrounding the club and the apartment complex in which Martinez lived on the
night of the incident, police were unable to find a firearm. A black revolver--a Taurus .38
Special--was found the next day in front of a storage building near the club and behind the
apartment complex. In the process of searching for the revolver, Detectives Allen and
Kroos encountered a woman who identified herself as a resident of the apartment
complex. (5) She told the detectives that she was awakened the previous night by someone
yelling "Throw it, throw it, the cops." 

 Detective Allen testified that, based on his training and experience, the revolver
would have made a click noise if it had misfired and that the revolver appeared to have
"five expended ammunition cartridges or brass casings." (6) Detective Allen did not search

the revolver for fingerprints, but he believed that Detective Kroos had submitted the
revolver to be processed for fingerprints. Detective Allen admitted that the revolver had
rust on it, but later testified that rust could have formed on the revolver due to improper
care of the revolver. Detective Kroos admitted that neither the tip jar nor the cash register
were checked for fingerprints. He also admitted that no fingerprints were found on the
revolver but that the revolver constituted a deadly weapon.

 Officer Robert Popps, a jailer with the Victoria County Sheriff's Department, testified
that Davis was incarcerated in the jail where Officer Popps worked. Officer Popps noted
that he intercepted two letters sent by Davis to his brother, who was housed in the same
jail. Officer Popps identified the State's Exhibits 24 and 25 as the letters that he had
intercepted from Davis. The letter introduced as State's Exhibit 24 provided the following:

 Erica[ (7)] came to jail for talkin shit to the laws [sic]. I rob [sic] the club for a
1,000 dollars[.] [T]hey can't charge me cause [sic] they don't have the gun. 
I'm gonna bond out. Soon when they tell me my bond I been out here on
some gansta [sic] shit bro fo [sic] real.


The letter introduced as the State's Exhibit 25 provided as follows:

 Say bro I rob [sic] the club for 1,000[.] [T]hey an't [sic] got shit on me coz
[sic] they don't have the gun so most likely I'm gonna bond out[.] I got to wait
in [sic] see what they [are] gonna do to Erica once they let here [sic] go[.] I'll
be alright[.] [T]he only reason why they brought Erica to Jail cuz [sic] she
was talkin shit to the laws [sic] . . . . I [have] been out here on some gansta
[sic] shit you thought. 


Officer Popps testified that both letters were written in the same handwriting and that Davis
admitted that the letters were his. Once Officer Popps intercepted the letters, he passed
the letters on to his supervisor. 

B. Davis's Evidence


 Davis called two witnesses to testify on his behalf--Sergeant Gamez and Officer
Edward Flores. Sergeant Gamez testified that no photographs were taken of the crime
scene because there was nothing of significance to photograph. She further testified that
the police were familiar with Davis because they were investigating him regarding another
incident, thus aiding in their identification of Davis based on the tattoo on his neck. 
Sergeant Gamez noted that she was present when Davis was arrested and that he did not
appear drunk or high on drugs when he was arrested. She also noted that Officer
Telamantes (8) was in charge of gathering statements from those who witnessed the incident
and that she had never heard of Godfrey, Gallaher, or Martinez. Sergeant Gamez recalled
that the tip jar and the register were checked for fingerprints. She was unaware of the
results of the fingerprint test on the tip jar, and she stated that Officer Telamantes was
unable to get any usable latent fingerprints from the register.

 Officer Flores stated that he was present when Davis was processed at the jail, and
he filled out the inventory report which was introduced as Defendant's Exhibit 1. The
inventory report stated that Davis had the following items, among other things, on his
person when he was processed at the jail: (1) four quarters and one nickel; (2) one pen;
(3) a black glove; (4) miscellaneous sheets of paper; and (5) two condoms. 

 The jury subsequently found Davis guilty of aggravated robbery, sentenced him to
sixty years' incarceration in the Texas Department of Criminal Justice-Institutional Division,
and assessed a $10,000 fine. Davis filed his notice of appeal on August 16, 2007, and the
trial court certified Davis's right to appeal on August 20, 2007. On September 14, 2007,
Davis filed a motion for new trial and a motion in arrest of judgment, arguing that the
evidence was insufficient to support the jury's verdict. The trial court denied Davis's
motions on September 19, 2007. This appeal ensued. II. Legal and Factual Sufficiency of the Evidence Supporting Davis's Conviction


 In his first three issues on appeal, Davis argues that the evidence adduced at trial
did not support a conviction of aggravated robbery. See id. § 29.03. Specifically, Davis
contends that there was a "temporal disconnect" between the stealing of the tip jar and the
return to the club; therefore, the return to the club constituted an entirely different criminal
episode for which the evidence demonstrated that Davis did not commit theft. In addition,
Davis contends that the evidence did not demonstrate that he displayed or utilized a deadly
weapon in stealing the tip jar. Davis also asserts that the State did not present factually
sufficient evidence connecting him to the offense. The State argues that the stealing of
the tip jar and the subsequent return to the club constituted a single criminal episode, and
that the evidence adduced at trial pertaining to these two events supports Davis's
conviction. The State also argues that the evidence connecting Davis to the offense is
factually sufficient because several eyewitnesses identified him as the gunman at the club.

A. Standard of Review

 In conducting a legal sufficiency review, we view the relevant evidence in the light
most favorable to the verdict to determine whether a rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt. Hooper v. State, 214
S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson v. Virginia, 443 U.S. 307, 318-19
(1979)); Escamilla v. State, 143 S.W.3d 814, 817 (Tex. Crim. App. 2004). The trier of fact
is the sole judge of the facts, the credibility of the witnesses, and the weight given to
testimony. See Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Beckham v. State,
29 S.W.3d 148, 151 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). We do not
reevaluate the weight and credibility of the evidence, nor do we substitute our own
judgment for the trier of fact. King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000);
Beckham, 29 S.W.3d at 151. Instead, we consider whether the jury reached a rational
decision. Beckham, 29 S.W.3d at 151. We must resolve any inconsistencies in the
evidence in favor of the judgment. Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App.
2000).

 In a factual sufficiency review, we review the evidence in a neutral light to determine
whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly
unjust, or the jury's verdict is against the great weight and preponderance of the evidence.
Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). This Court will not
reverse the jury's verdict unless we can say with some objective basis in the record that the
great weight and preponderance of the evidence contradicts the verdict. Id. at 417.

 The State is not required to present direct evidence, such as eyewitness testimony,
to establish guilt. See Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).
"Circumstantial evidence is as probative as direct evidence in establishing the guilt of the
actor, and circumstantial evidence alone can be sufficient to establish guilt." Hooper, 214
S.W.3d at 13; Guevara, 152 S.W.3d at 49. The law does not require that each fact "point
directly and independently to the guilt of the appellant, as long as the cumulative effect of
all the incriminating facts is sufficient to support the conviction." Hooper, 214 S.W.3d at
13; Guevara, 152 S.W.3d at 49.

 Both legal and factual sufficiency are measured by the elements of the offense as
defined by a hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240 (Tex.
Crim. App. 1997); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002, pet.
ref'd). Under a hypothetically correct jury charge, a person commits aggravated robbery
"if he commits robbery . . . and he . . . uses or exhibits a deadly weapon . . . ." Tex. Penal
Code Ann. § 29.03 (Vernon 2003). Moreover, a person commits robbery "if, in the course
of committing theft . . . and with intent to obtain or maintain control of the property, he . .
. intentionally or knowingly threatens or places another in fear of imminent bodily injury or
death." Id. § 29.02 (Vernon 2003). A person acts intentionally with respect to a result of
his conduct when it is his conscious objective or desire to engage in the conduct or cause
the result. Id. § 6.03(a) (Vernon 2003). 

B. The Evidence Pertaining to the Usage or Display of a Firearm Davis argues that the State's evidence does not establish that he used or displayed
a deadly weapon "in the course of committing a theft." See Tex. Penal Code Ann. §
29.01(1) (Vernon 2003). Thus, Davis states that he could not have committed aggravated
robbery. Davis also argues that he did not steal anything from the club; therefore, no theft
occurred.

 Section 29.01(1) of the penal code provides that the phrase "in the course of
committing a theft" means "conduct that occurs in an attempt to commit, during the
commission, or in immediate flight after the attempt or commission of theft." (9) Id. (emphasis
added). In analyzing section 29.01(1), the Texas Court of Criminal Appeals and this Court
have held that:

 The offenses of robbery and aggravated robbery, as defined . . . do not
require as an element thereof that the property sought actually be obtained. 
It is sufficient to show an intent to obtain (or maintain) control of the property,
an accompanying theft or attempted theft, and the additional acts with
requisite intent set forth in Sections 29.02(a)(1) or (2), 29.03(a)(1) or (2) . .
. . Since the actual success of obtaining the property sought is not an
element of the offense of aggravated robbery, the fact that the acts tend but
fail to obtain the property does not render them insufficient to effect the
commission of the offense of aggravated robbery.


Watts v. State, 516 S.W.2d 414, 415 (Tex. Crim. App. 1974); see Earl v. State, 514
S.W.2d 273, 274 (Tex. Crim. App. 1974) ("Thus the actual commission of the offense of
theft is not a prerequisite to commission of a robbery . . . ."); see also Cates v. State, No.
13-95-325-CR, 1997 Tex. App. LEXIS 4833, at *15 (Tex. App.-Corpus Christi Aug. 28,
1997, no pet.) (mem. op., not designated for publication). (10) 

 Considering only the events surrounding Davis's return to the club, we hold that the
evidence adduced at trial is legally and factually sufficient to support his conviction. (11)
Godfrey, Gallaher, Kelly, and Demas each testified that Davis entered the club and pointed
a firearm at Demas and other patrons of the club. Demas noted that Davis pointed the
firearm at his head and pulled the trigger repeatedly, producing several audible "clicks" that
were heard by several witnesses. At that time, Demas yelled, "gun," and quickly ran for
cover. (12) Shortly thereafter, Demas observed Davis fumbling with the cash register while
still aiming the firearm. The jury could have reasonably concluded that this constituted an
attempt to commit theft. See Tex. Penal Code Ann. § 29.01(1). Later, Demas identified
the black revolver found by police at the nearby apartment complex as the firearm used
by Davis in the commission of the offense. Officer Flores's testimony that Davis only had
$1.05 on his person at the time of arrest seems to suggest that Davis's attempt to steal
money from the cash register was not successful. However, as noted earlier, a successful
theft is not required to sustain a conviction for aggravated robbery. See Watts, 516 S.W.2d
at 415; Earl, 514 S.W.2d at 274; see also Cates, 1997 Tex. App. LEXIS 4833, at *15. 

 We find that the cumulative effect of all the incriminating facts suggests that Davis
intended to steal from the club's cash register while using a deadly weapon, a firearm. See
Tex. Penal Code Ann. §§ 29.02, 29.03; see also Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007) ("This standard [the legal sufficiency standard] accounts for the
factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts. . . . [W]e determine whether the
necessary inferences are reasonable based upon the combined and cumulative force of
all the evidence when viewed in the light most favorable to the verdict.") (internal quotations
omitted); Hooper, 214 S.W.3d at 13; Guevara, 152 S.W.3d at 49. We therefore conclude
that the evidence demonstrating Davis's use of a deadly weapon in the commission of an
aggravated robbery is legally sufficient. See Hooper, 214 S.W.3d at 13; Guevara, 152
S.W.3d at 49. Moreover, in viewing the evidence in a neutral light, we cannot say that the
jury's determination that Davis used a deadly weapon in the commission of this offense is
clearly wrong and manifestly unjust or against the great preponderance of the evidence. 
See Watson, 204 S.W.3d at 414-15. Therefore, the evidence was factually sufficient to
support that determination. 


C. The Evidence Connecting Davis to the Alleged Aggravated Robbery


 Next, Davis asserts that the testimony of the State's witnesses was inconsistent;
therefore, the evidence connecting him to the aggravated robbery was factually insufficient. 
In particular, Davis contends that the witnesses disagreed about his physical appearance,
what he was wearing that night, and his general demeanor prior to the stealing of the tip
jar.

 Demas testified that Davis was wearing a gray sweater with the number seven on
it, and Godfrey and Gallaher recalled that Davis was wearing a black hooded sweatshirt. 
Demas noted that Davis had a mustache; however, Godfrey could not recall if Davis had
a beard or a mustache. Finally, Demas stated that Davis refused to make eye contact with
him when Demas was attempting to collect Davis's cover charge and that Davis appeared
to be "casing" the club. Godfrey and Gallaher both remembered that Davis was acting
strangely, as if he was drunk or on drugs. Kelly, on the other hand, did not recall Davis
acting strangely. Davis asserts that these inconsistencies in the testimony render the
evidence connecting him to the aggravated robbery factually insufficient. 

 We note that the jurors were free to accept or reject any or all of the witnesses'
testimony that they did not believe to be credible. See Davila v. State, 147 S.W.3d 572,
575 (Tex. App.-Corpus Christi 2004, pet. ref'd) (citing Alvarado v. State, 818 S.W.2d 100,
105 (Tex. App.-San Antonio 1991, no pet.)); see also Lancon v. State, 253 S.W.3d 699,
705 (Tex. Crim. App. 2008) ("The jury is in the best position to judge the credibility of a
witness because it is present to hear the testimony, as opposed to an appellate court who
relies on the cold record."). Although there were some inconsistencies in the testimony
presented, these inconsistencies were not enough to render the evidence insufficient. See
Davila v. State, 147 S.W.3d 572, 575 (Tex. App.-Corpus Christi 2004, pet. ref'd) (holding
that contradictory testimony from witnesses does not render the evidence insufficient)
(citing Mercado v. State, 695 S.W.2d 25, 29 (Tex. App.-Corpus Christi 1985), aff'd, 718
S.W.2d 291 (Tex. Crim. App. 1986)). 

 Here, two witnesses--Demas and Kelly--identified Davis in open court as the
perpetrator of the offense. (13) Furthermore, Officer Wilkins testified that he presented a
lineup to Demas shortly after the incident had occurred, and Demas identified Davis as the
perpetrator. Based on the evidence presented, we cannot say that the evidence is so
weak that the jury's determination that Davis was the perpetrator seems clearly wrong and
manifestly unjust or against the great weight and preponderance of the evidence. See
Watson, 204 S.W.3d at 414-15. Accordingly, we overrule Davis's first three issues. 

III. Ineffective Assistance of Counsel


 In his fourth issue, Davis contends that his trial counsel's failure to object to the
admission of evidence connecting him with the weapon found by police amounted to
ineffective assistance of counsel. The State counters by arguing that Davis's trial counsel
did object to the admission of evidence connecting Davis with the weapon found by police
and that trial counsel's strategy was probably intended to de-emphasize facts presented
to the jury. 

A. Applicable Law

 

 To establish ineffective assistance of counsel, Davis must show: (1) his attorney's
representation fell below an objective standard of reasonableness; and (2) there is a
reasonable probability that, but for his attorney's errors, the result of the proceeding would
have been different. See Strickland v. Washington, 466 U.S. 668, 684 (1984); Hernandez
v. State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); Jaynes v. State, 216 S.W.3d 839, 851
(Tex. App.-Corpus Christi 2006, no pet.). Whether this test has been met is to be judged
on appeal by the totality of representation, not by any isolated acts or omissions. Jaynes,
216 S.W.3d at 851. The burden rests on the appellant to prove ineffective assistance of
counsel by a preponderance of the evidence. Thompson v. State, 9 S.W.3d 808, 813
(Tex. Crim. App. 1999) (citing Cannon v. State, 668 S.W.2d 401, 403 (Tex. Crim. App.
1984)). 

 Our review of counsel's representation is highly deferential, and we will find
ineffective assistance only if the appellant overcomes the strong presumption that his
counsel's conduct fell within the wide range of reasonable professional assistance. See
Strickland, 466 U.S. at 689; Jaynes, 216 S.W.3d at 851. The right to "reasonably effective
assistance of counsel" does not guarantee errorless counsel or counsel whose
competency is judged by perfect hindsight. Saylor v. State, 660 S.W.2d 822, 824 (Tex.
Crim. App. 1983). Moreover, the acts or omissions that form the basis of appellant's claim
of ineffective assistance must be supported by the record. Thompson, 9 S.W.3d at 814;
Jaynes, 216 S.W.3d at 851. A silent record which provides no explanation for counsel's
actions usually will not overcome the strong presumption of reasonable assistance.
Thompson, 9 S.W.3d at 813-14.

B. Discussion

 Davis alleges that his trial counsel provided ineffective assistance because he failed
to renew an objection to Martinez's testimony regarding her mother and grandmother's
statements about the disposal of the gun. Davis suggests that his trial counsel should
have continued to object to Martinez's testimony even after the trial court had overruled his
objection. 

 In reviewing the record, we find that Davis is correct in stating that his trial counsel
initially objected to Martinez's testimony as hearsay. We also find that trial counsel made
numerous other objections to proffered testimony at trial and filed numerous pleadings on
behalf of Davis. We must be careful to not analyze trial counsel's performance based on
isolated incidents but rather on the totality of his representation. Jaynes, 216 S.W.3d 839
at 851. Davis admits that the record is silent as to trial counsel's strategy for not
continually objecting to Martinez's testimony. Furthermore, we are not privy to the
discussion that took place at the bench prior to the trial court's overruling of trial counsel's
hearsay objection. 

 The Texas Court of Criminal Appeals has recently stated the following with respect
to ineffective assistance claims:

 We decline to find counsel ineffective on this basis on the record before us. 
As we have done many times before, we point out that the record on direct
appeal is usually inadequate to address ineffective assistance claims. 
Goodspeed v. State, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Before
granting relief on a claim that defense counsel failed to do something, we
ordinarily require that counsel be afforded the opportunity to outline the
reasons for the omission. Id. To warrant reversal without affording counsel
such an opportunity, the challenged conduct must be "so outrageous that no
competent attorney would have engaged in it." Id. 


Roberts v. State, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007). Because the record is
silent as to trial counsel's strategy, we must examine whether his alleged failure to object
to Martinez's testimony is "'so outrageous that no competent attorney would have engaged
in it.'" See id. (quoting Goodspeed, 187 S.W.3d at 392).

 As mentioned earlier, Martinez testified that her mother and grandmother heard
someone exclaim, "[c]hunk it, chunk it, the cops are coming." Martinez later admitted that
she neither heard the statements made nor witnessed any object thrown. However,
several witnesses identified Davis as the perpetrator of the offense and noted that Davis
used a firearm in the commission of the crime. Furthermore, Demas identified the revolver
found by police as the firearm that Davis had used. 

 It is plausible that Davis's trial counsel did not wish to inflame the jury or the court
or highlight certain facts by continuously objecting to Martinez's testimony. Furthermore,
Davis's trial counsel likely was aware that Texas courts have affirmed convictions even
though the alleged deadly weapon was never found. See Magana v. State, 230 S.W.3d
411, 414 (Tex. App.-San Antonio 2007, pet. ref'd) (affirming an aggravated assault
conviction and noting that the State does not have to introduce the weapon into evidence
to prove that it was a deadly weapon) (citing Morales v. State, 633 S.W.2d 866, 868 (Tex.
Crim. App. 1982)); see also Hunter v. State, Nos. 01-00-00722-CR & 01-00-00726-CR,
2001 Tex. App. LEXIS 4532, at **4-6 (Tex. App.-Houston [1st Dist.] July 5, 2001, no pet.)
(mem. op., not designated for publication) (affirming a conviction even though the firearm
used in the commission of the offense was never found); Jeffery v. State, No. C14-84-329-CR, 1985 Tex. App. LEXIS 6581, at *3 (Tex. App.-Houston [14th Dist.] Apr. 25, 1985, no
pet.) (mem. op., not designated for publication) (same). 

 Because it is plausible that Davis's trial counsel did not wish to inflame the jury or
the court or highlight certain facts by continuously objecting to Martinez's testimony, and
because it is likely that Davis's trial counsel was aware of case law stating that the deadly
weapon need not be found in order to sustain a conviction, we cannot say that the actions
of Davis's trial counsel were so outrageous as to overcome the presumption of reasonable
assistance. See Roberts, 220 S.W.3d at 533; Goodspeed, 187 S.W.3d at 392; see also
Thompson, 9 S.W.3d at 813-14. Accordingly, we overrule Davis's fourth issue. 

IV. Conclusion


 Having overruled all of Davis's issues on appeal, we affirm.


 

 

 DORI CONTRERAS GARZA,

 Justice


Do not publish. 

Tex. R. App. P. 47.2(b).

Memorandum Opinion delivered and 

filed this the 23rd day of April, 2009.
1. The punishment range for a first-degree felony is "not more than 99 years or less than 5 years." Tex.
Penal Code Ann. § 12.32(a) (Vernon 2003).
2. The indictment further provided that:


 Prior to the commission of the aforesaid offense (hereafter styled the primary offense), on
the 18th day of April, A.D. 2002, in cause number 2-3912 in the County Court of Victoria
County, Texas, a juvenile court, the defendant was adjudicated under Section 54.03, Family
Code, to have engaged in delinquent conduct constituting the felony offense of Burglary of
a Habitation, committed on June 26, 2001[,] for which the defendant was committed to the
Texas Youth Commission under Section 54.04(d)(2) Family Code, and was not for a state
jail felony punished under Section 12.35(a).
3. Kelly and Demas identified Davis as the gunman and as the individual who stole Demas's tip jar.
4. Several witnesses testified that there is a fence in between the Maximus club and the apartments
where Martinez lived.
5. Police never discovered the identity of this woman other than that she was a resident of apartment
number 11. Detective Kroos stated that the woman quickly left the scene after disclosing the information to
police.
6. In a statement made to police shortly after the incident, Demas noted that Davis had fired the
revolver five times, resulting in five audible "clicks"; however, at trial, Demas testified to only hearing three
"clicks."
7. Erica is Davis's cousin. The record reflects that her full name is Erica McClure. She testified that
she was present with Davis at the club on the night of the incident, and that she lost track of Davis during the
alleged robbery because Davis told her that he was going around the corner to use the restroom.
8. The record is unclear as to Officer Telamantes's first name.
9. Section 31.03 of the penal code provides that a person commits theft "if he unlawfully appropriates
property with intent to deprive the owner of property." Id. § 31.03(a) (Vernon Supp. 2008). 
10. Davis cites to case from this Court, Blount v. State, 851 S.W.2d 359, 363 n.3 (Tex. App.-Corpus
Christi 1993, no pet.), for the proposition that a robbery or aggravated robbery conviction cannot be sustained
without a completed theft. We disagree. In Blount, this Court explained that "although theft is an integral part
of the offense of aggravated robbery, the actual completion of a theft is not necessary for conduct to constitute
robbery." Id. at 364 (citing Cook v. State, 840 S.W.2d 384, 389 (Tex. Crim. App. 1992)) (emphasis in original). 
With respect to theft, the evidence must show that either a theft or an attempted theft occurred. See id. If
neither a theft nor an attempted theft has occurred, then a defendant cannot be convicted of robbery or
aggravated robbery. Id. at 363 n.3 (citing Cook, 840 S.W.2d at 387); see Ex parte Santellana, 606 S.W.2d
331, 333 (Tex. Crim. App. 1980) ("Two criminal acts are implicit in the offense of aggravated robbery: a theft,
whether attempted, in progress, or completed, and an assault, which in the instant case was allegedly done
by threat with a deadly weapon."). Here, the evidence suggests that an attempted theft occurred and that
Davis used a firearm to commit an assault. 
11. Because we conclude that the evidence of the events pertaining to Davis's return to the club is
legally and factually sufficient to support his conviction for aggravated robbery, we need not consider the
evidence regarding Davis's stealing of the tip jar. See Tex. R. App. P. 47.1. 
12. Davis argues that Demas never testified that he was fearful for his life and that Demas's attempt
to ward Davis off using an empty beer bottle indicated that he was not scared of Davis. We disagree. Demas
ran into the club screaming "gun" after Davis had aimed the gun at his head; therefore, it would have been
reasonable for the jury to conclude that Demas was fearful for his life. In any event, the aggravated robbery
statute, section 29.03 of the penal code, provides that a person commits robbery and "(1) causes serious
bodily injury; (2) uses or exhibits a deadly weapon; or (3) causes bodily injury to another person or threatens
or places another person in fear of imminent bodily injury or death . . . ." Tex. Penal Code Ann. § 29.03(a)
(Vernon 2003) (emphasis added). As previously mentioned, several witnesses testified that Davis used a
firearm in the commission of this offense. The court of criminal appeals has held that a firearm is a per se
deadly weapon. See Polk v. State, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985). Therefore, whether Demas
was fearful for his life is irrelevant. See Tex. Penal Code Ann. § 29.03(a). 
13. It is also noteworthy that: (1) Davis, in writing to his brother, admitted that he had robbed a club for
$1,000 on the night of the incident; and (2) Erica, his cousin, had spoken to law enforcement about the
aggravated robbery at the club where she admitted that she and Davis were in the vicinity of the club at the
time the incident transpired.